HERBERT RATIGAN'S (dependents') CASE.

Suffolk. November 5, 1958. — March 18, 1959.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Proximate Cause. Death. Workmen's Compensation Act,* Recommittal to Industrial Accident Board.

Testimony primarily medical in a workmen's compensation case warranted a finding by the Industrial Accident Board that death of the employee from coronary thrombosis at home in the evening, following his suffering angina attacks in the forenoon which were causally related to the work he was then doing in the course of his employment, was not causally related to the angina attacks or to his employment. [717–718]

Upon appeal by a dependent of a deceased employee in a workmen's compensation case from a final decree of the Superior Court dismissing the claim for compensation following certification of a decision of the reviewing board affirming and adopting the findings of the single member and his decision dismissing the claim, this court, being in doubt as to the meaning of certain material language in the decision of the single member, reversed the decree and ordered the case recommitted to the Industrial Accident Board for a further finding clarifying the language questioned. [718]

CERTIFICATION to the Superior Court of a decision by the Industrial Accident Board under the workmen's compensation act.

The case was heard by *Paquet,* J.

*Charles J. Kickham, Jr., (Samuel Zaharoff* with him,) for the claimant.

*James C. Gahan, Jr.,* for the insurer.

COUNIHAN, J. This is an appeal by the widow of a deceased employee of the Eastern Gas and Fuel Company from a decree of the Superior Court dismissing her claim for dependency compensation on account of the death of the

employee. G. L. c. 152, as amended. The single member found that "the employee suffered two angina attacks in the forenoon [of April 2, 1954]; that these attacks were causally related to the work he was doing at the time the attacks occurred. I find, however, in the absence of any evidence of symptoms relating to a heart condition between the time he left work and the time he died that evening, that the employee's death was not causally related to his illness of earlier in the day, or to his employment at the Eastern Gas and Fuel Company. The widow's claim for compensation is therefore dismissed."

A reviewing board of five members unanimously affirmed and adopted the findings and decision of the single member after reversing the action of the single member in excluding two questions in cross-examination put to Dr. Norman Welch, a medical expert called by the insurer. The doctor was asked, "Assuming that evidence is introduced that the man did have further sufferings as the day went on, from 10:30 in the morning to the time of his death, complained that he still had pain and restriction about the neck, etc., would that change your opinion?" He answered, "Yes, it would." The other question was, "Is it fair to say that, if there is competent evidence introduced in this case would you then be willing to agree there was probable connection between the original attack and the death?" The record does not show that this question was answered, but subsequently the doctor stated, "If you mean to imply that this man had symptoms, continuing pain from the time of the onset of the attack, that certainly would alter my opinion."

The following facts do not appear to be disputed: The deceased was thirty-eight years old. He had been employed in the Everett plant of his employer for at least nine years. He lived in Walpole and his wife and three minor children were dependent upon him for their support. His work duties varied. Among other things he did clerical work, recorded temperatures, checked gauges and cleaned out "pipe throats." On April 2, 1954, he arrived at work at about 8 A.M. and shortly after 9 A.M. he began work as a leader of a

three man crew to clean out the "pipe throats." This work was done in a so called alley where there were about sixty-eight valves on doors behind which the "pipe throats" were located. Their function is to pass gas to the flues and there is an orifice or restriction in a "throat" that has to be blown out, to keep it uniform in diameter. This is called a reverse process. The "pipe throat" is reached by a door four to six inches off the floor and the orifice is in seven inches from the door. The door must be opened by turning a valve approximately fifty times and a run usually takes in seventeen doors. In order to open the door the lead man must bend down in a squatting position to turn the valves. The run takes about fifteen or twenty minutes. The first man opens the doors by turning down the valves. Oil is put in the valve stem to make it easy to close down. The second man by pressure inserts air into the throats to clean out the dust or residual. The third man closes the door and rolls up the valves. After the first run the employee had a pain and he was finding it difficult to breathe. He went to an open outside door and got some fresh air. He started on the second run and when it was almost completed he complained of a severe pain in his chest, a pain in his jaw, and shortness of breath. At about 10:30 A.M. it was suggested that he go to the first aid station and he never came back to join his fellow workers.

The following relates to the physical condition of the employee. The widow of the employee who is the claimant testified that he was "O.K." before he left for work at 6:45 A.M. and that he died at 6:40 P.M. that night in his living room. Her husband had met her in Norwood at 5:45 P.M., put a few light bundles in his automobile, and drove her home. She was not asked and did not testify to anything unusual in the appearance, physical or otherwise, of the employee at that time.

There were four physicians who testified as to the condition of the employee after he quit work. Doctor Abraham Leavitt of Everett, a physician in general practice, was in charge of the first aid station at the Everett plant. He saw the employee in the first aid station about 11 A.M. He got

a history that while at work he suddenly felt weak, with a squeezing sensation in his chest, radiating down both arms. He had a suffocating feeling in his throat, which was intermittent. He examined the employee and X-rayed him. He found no evidence of a poor heart condition, except from the history which the employee gave him. He advised that the employee go to a hospital but he absolutely refused. The doctor would not permit the employee to drive his own automobile home but insisted that he go home in a company automobile. The doctor said that the employee looked pretty good to him and that he said he had no discomfort at that time. The doctor examined his heart with a stethoscope and discovered nothing.

Doctor Norman Welch, a recognized internist and heart specialist, was called by the insurer. He had never seen the employee but he was present at the hearing before the single member and heard of the kind of work the employee had been doing on the day of his death and of his attack during work. He also heard the testimony of Dr. Leavitt and Dr. Sagall. He gave it as his opinion that the employee had suffered an attack of angina which was brought about as the result of exertion when at work and which would disappear when exertion ceased or with the use of nitroglycerin. If angina progresses it can eventually produce a condition known as coronary thrombosis. In his opinion there was no relationship between the pain he suffered when at work and the coronary thrombosis from which he died. Doctor Welch did not think that the death of the employee from coronary thrombosis was accelerated, aggravated, or complicated by the activities in which he was engaged on the morning of April 2, 1954. He may have had a severe case of angina. His opinion was that exertion or angina would not bring about coronary thrombosis unless there was continuous pain between the time he quit work and the time he died. There is a difference between a coronary attack and an angina attack. If the angina attack had progressed into a coronary thrombosis, the employee would have had a continuous pain all day after he quit work until

he died. According to the testimony of Dr. Leavitt no such condition existed.

Doctor Elliot Sagall, a recognized and qualified internist, testified that he had never examined the employee during his life. In answer to a hypothetical question which accurately described the work the employee was doing that morning and the happenings in connection with it, he stated that "the work that this man was doing in the first run . . . probably aggravated a preëxisting coronary disease that led to acute coronary insufficiency and that this condition continued and was aggravated by the work, the activity involved in the second run and that this condition led directly to his death and that therefore, the work that he was doing aggravated the preëxisting disease and directly led to his death." Doctor Sagall based his opinion partly on the fact that "this man stopped the second run, went home, was continuously sick and died that evening." He also said that the "exertion of getting into a car or driving possibly would aggravate the condition."

Doctor Sagall was of opinion that exertion in the employee's work occasioned by stooping down and turning the valves led within a ten minute period to a coronary insufficiency which brought about the coronary thrombosis which caused his death.

Doctor Frank J. Allendorf of Walpole testified that he saw the employee about 1:45 P.M. on April 2, 1954, at his office. He was the family doctor. He asked him what the trouble was and the employee said that he had some pressure through his chest and also some pain radiating up into his armpits and pain under his tongue. After further talk the employee said it occurred at work and that a doctor sent him home because of his condition. Doctor Allendorf examined him and he did not find too much from a physical standpoint. He felt there was a question of a coronary. He told him to go home and rest and that he would call and see him on his way home. The doctor found nothing wrong with the employee when he saw him at the office. He made out the death certificate giving the cause of death

as coronary thrombosis. In recross-examination the doctor said that the employee told him that he had some difficulty at work. In redirect examination the doctor stated that the employee said when he was examining him that he had this pressure over his chest. No autopsy was ever held.

The claimant contends that the single member erred in finding that "in the absence of any evidence of symptoms relating to a heart condition between the time he left work and the time he died that evening . . . the employee's death was not causally related to his illness of earlier in the day, or to his employment at the Eastern Gas and Fuel Company," in view of the last statement in the testimony of Dr. Allendorf that the employee said when that doctor was examining him that "he had this pressure over his chest." She asserts that this finding was wholly lacking in evidential support. Assuming for the purpose of discussing this case that pain and pressure have the same meaning, we believe that the single member, although he put it ineptly, was adopting the opinion of Dr. Welch in which he said, "If you mean to imply that this man had symptoms, continuing pain from the time of the onset of the attack, that certainly would alter my opinion."

The testimony of Dr. Allendorf in many respects was so vague, indefinite, and ambiguous that the single member may well have disregarded it.

There was ample evidence from Dr. Leavitt and inferentially from the testimony of the wife of the employee that he did not suffer continuing pain from the time of the onset of the original attacks to the time of his death.

It is significant that Dr. Sagall testified that the "exertion of getting into a car or driving possibly would aggravate the condition." The single member may well have concluded that the driving of the automobile from Walpole to Norwood, putting his wife's bundles in the automobile, and driving her back to Walpole so aggravated the condition of the employee that he died shortly after he got home that evening.

In any event it is well established that the causal relationship between the occupation of the employee and his death

is a question of fact to be determined by the Industrial Accident Board. The findings of the board must be supported and they are not to be reversed unless they are wholly lacking in evidential support or are tainted by error of law. *Lysaght's Case,* 331 Mass. 451, 452–453. *Brek's Case,* 335 Mass. 144, 147. This rule applies as well to a case where the relevant evidence is based primarily on the testimony of medical experts. "Its probative value was for the fact finding tribunal to decide." "It is not for us to determine whether the opinion of the doctor was medically sound." *Murphy's Case,* 328 Mass. 301, 304. And in *Mahoney's Case,* 337 Mass. 629, at p. 632, it was said, "A decision upon the question of causation was one of fact, resting entirely upon medical knowledge and within the province of the board to determine. Unless lacking in evidential support it cannot be disturbed by us." See cases cited.

We are, however, in doubt as to the meaning of certain language in the decision of the single member which was affirmed and adopted by the reviewing board. The single member stated, "I find, however, in the absence of any evidence of symptoms relating to a heart condition between the time he left work and the time he died that evening, that the employee's death was not causally related to his illness of earlier in the day, or to his employment at the Eastern Gas and Fuel Company." Does this language mean, in apparent disregard of the testimony of Dr. Allendorf of an isolated instance of symptoms of a heart condition when he examined the employee, that there was no evidence of symptoms of a heart condition after he left work and before he died, or does it mean that there was no evidence of continuing symptoms of a heart condition during that period?

Justice requires the exercise of the power of this court to recommit this case to the Industrial Accident Board to resolve this doubt. There has been a full hearing of the case and the board is not required to have further evidence received. What is needed is an addition to the findings of the board of a further finding clarifying the language we have referred to. The decree must be reversed and the case

is to be recommitted to the Industrial Accident Board for further proceedings not inconsistent with this opinion. *Ward's Case,* 286 Mass. 72, 76–77.

*So ordered.*