JOHN HERSON'S CASE.

Suffolk.    October 4, 1960. — November 14, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Workmen's Compensation Act*, Findings by Industrial Accident Board, Recommittal to Industrial Accident Board, Appeal, Notice, Filing of claim.

In a workmen's compensation case involving an employee with preexisting heart disease who suffered heart attacks from exertion while at work, where there was no statutory notice of the injury and the claim was not seasonably filed, subsidiary findings by the Industrial Accident Board on the issues of knowledge of the injury on the part of the employer or insurer and absence of prejudice of the insurer within G. L. c. 152, §§ 44, 49, apart from a finding that the employee received adequate medical attention promptly, were insufficient to enable this court to determine the propriety of conclusions of the board in favor of the employee on those issues, and the case was ordered recommitted to the board for further subsidiary findings.    [407–408]

A motion by the insurer in a workmen's compensation case for an exten-

sion of the record, filed for the first time in this court on appeal from a decree of the Superior Court, was denied without prejudice to the insurer's seeking further to obtain a complete record after additional findings by the Industrial Accident Board for the making of which the case was ordered recommitted to the board. [408]

CERTIFICATION to the Superior Court of a decision by the Industrial Accident Board under the workmen's compensation act.

The case was heard by *DeSaulnier, J.*

*Edmund Z. Dymsza,* for the insurer.

*Henry A. Tempone, (Jerome Berent* with him,) for the claimant.

CUTTER, J.   This is an appeal by a workmen's compensation insurer from a decree of the Superior Court sustaining an award of the Industrial Accident Board to an employee for an alleged injury on June 14, 1954. The award was based upon findings of a single member as supplemented and slightly modified by the reviewing board.

The insurer seems now to make no contention that the evidence was not sufficient to warrant the reviewing board's finding that "the employee had a preëxisting coronary heart disease which was complicated by arterial hypertension and that his heart attack of June 14, 1954, was precipitated by the physical exertions required by his usual work of furniture mover and his further attacks and the incapacity subsequent to the initial attack are causally related to such initial attack." The insurer contends only that the employee's claim is barred under G. L. c. 152, §§ 41, 42, 43, 44, and 49 (as amended through St. 1953, c. 314, § 6), because of failure (a) to give the statutory notice of injury and (b) to file claim within six months after the occurrence of the alleged injury.

1. The employee worked for a furniture company. On June 14, 1954, he helped to load a truck with furniture. While doing this work, he began to feel "tightness . . . in his chest, started to sweat. He got dizzy, was '. . . gasping for air, just could not . . . get enough air into his system.' . . . When he came back from loading he told his boss who said to take it easy the rest of the day and . . .

he went downstairs and lay down." He saw a doctor that afternoon, and did not work the next day. Upon his return to the store on the 16th he "generally did not feel good . . . and spoke to his boss . . . thought he was going home and the boss asked him to do him a favor" and make one more delivery. He did so, and while "going upstairs with a studio couch . . . this pain [in his chest] became terrific." He returned to the store, called Dr. Friedman and was referred to Dr. Ayman who examined him. He was admitted to a hospital on June 16 and remained there until July 2. He did not return to work until late August. Then he was put on light work. In November upon returning upstairs from a trip to the cellar of the store "he was gasping and faint so sat down on the chair; the boss came over . . . and said, 'John, I can't keep you here, God forbid that anything will happen, I hate to see you go, but if anything did happen, I would never forgive myself, I'm sorry but I will have to let you go." In December, 1954, he began to do clerical work for the Commonwealth and at the time of his testimony before the board (April 29, 1959) was still on this job, although he was to be "let go at the end of the fiscal year." He consulted Dr. Sagall prior to consulting, on December 18, 1958, Dr. Rattigan, who was called as a witness by the employee.

The 1954 hospital record was received in evidence. It indicated that an electrocardiogram failed to show infarction and that the employee "was well until . . . [two] days prior to admission when he developed severe . . . chest pain which lasted about one half hour. This pain came on at rest . . . . On the day of admission he lifted some refrigerators and furniture and then noted that the pain became more severe. No radiation of the pain. . . . [Patient] was seen by Dr. . . . Ayman before admission who took . . . [an electrocardiogram] which showed only slight evidence of coronary insufficiency." In some respects the employee's history recorded by Dr. Rattigan in 1958 and the employee's testimony in 1959 seem to vary from the history recorded by the hospital in 1954, particularly in respect of whether the pain came on while the employee was working

or at rest, a matter which Dr. Rattigan indicated in his somewhat general testimony was of some significance. The employee's testimony could have been found to indicate that by 1958 and 1959 his memory of his 1954 pains and symptoms had become dim. Electrocardiograms, apparently taken in 1954 by Dr. Ayman, Dr. Friedman, or the hospital, were examined in 1958 or 1959 and relied upon to some extent by Dr. Rattigan in giving his opinion whether and in what part of the heart the employee had sustained heart muscle injury. The record does not show that these electrocardiograms were produced or that they were available to the insurer although the insurer's counsel asked for them. There was no testimony explaining the absence of Drs. Friedman and Ayman or whether they were available to the insurer in 1958 and 1959.

The single member, on the issue of late notice and late claim, found only "that there was no prejudice caused by alleged lack of claim or notice, and, further, that the employer had something more than notice when he discharged the employee as physically unfit for his job." Little is added by the reviewing board's findings "that the employee has shown affirmatively that the insurer has not been prejudiced in respect of either late notice or late claim; he obtained adequate medical attention promptly. The insurer presented no witnesses, either lay or medical." The reviewing board also amended the record to show that the insurer before the single member "raised questions of 'late notice' and 'late claim' and 'prejudice to the insurer' in respect of both questions."

The findings on the issues of late notice and late claim are meager. Indeed, nowhere in the record does the employee's claim, or even its date, appear.[1] There is no finding about (a) when the employer or the insurer first received notice that an injury was claimed; (b) whether electrocardiograms made in 1954, relied upon to some ex-

---

[1] An affidavit attached to the insurer's motion referred to later in this opinion states that the employee's claim was filed on June 20, 1958, about four years after the alleged injury. We deal with the case without assuming that this statement is accurate.

tent by the employee's medical witness, who first saw the
employee in late 1958, were still available to the insurer
after the claim was filed; (c) whether after the claim was
filed the employer and insurer had access to doctors who,
although they treated the employee in June, 1954, did not
testify before the board; and (d) the reasons for the fail-
ure to give the statutory notice and the delay in filing a
claim.[2]

It is for the board to determine whether an employer or
insurer (a) had knowledge of an injury sufficient under
§ 44 to excuse a late notice of injury, or (b) has been preju-
diced by want of the statutory notice or by a late claim.
*Perrotta's Case,* 318 Mass. 737, 739. *Berthiaume's Case,*
328 Mass. 186, 190–191. *Davidson's Case,* 338 Mass. 228,
230–232. Its conclusion, if not tainted by error of law, will
stand if supported by the evidence. See *Ogonowsky's Case,*
338 Mass. 468, 471, and cases cited. See also *Channell's
Case,* 337 Mass. 124, 127–128.

The burden of showing lack of prejudice rests upon the
employee. See *Russell's Case,* 334 Mass. 680, 682–683, and
cases cited. Particularly if the statutory notice or the
filing of a claim is long delayed, there may be a "natural
inference that the absence of notice might well have preju-
diced the insurer by preventing an investigation of the
applicability of the workmen's compensation act." See
*Hatch's Case,* 290 Mass. 259, 262, where it was stated that
the employee's burden of proof can be "sustained by war-
rantable inferences from the circumstances, without evi-
dence specifically directed to disproving particular forms
of prejudice," but that this burden "cannot be supported
by surmise or conjecture." In several cases, where the
evidence failed to support the board's conclusion of absence
of prejudice, this court has set aside the board's decision.
See *Kangas's Case,* 282 Mass. 155, 158–160; *Booth's Case,*

2 There is also no precise finding that in 1954 the employer had knowledge
(see G. L. c. 152, § 44) that an alleged injury seemingly brought on by exer-
tion had taken place as distinguished (see *Kangas's Case,* 282 Mass. 155, 157)
from general knowledge merely that the employee had suffered from manifes-
tations of a heart condition. It may be that the single member inferred that
the employer had such knowledge from the evidence of the incidents prior to
the 1954 hospitalization, but he has not said so with clarity.

289 Mass. 322, 325; *Hatch's Case,* 290 Mass. 259, 261–263; *Meagher's Case,* 293 Mass. 304, 308–309; *Russell's Case,* 334 Mass. 680, 682–684.

We are asked to determine whether the confused, ambiguous testimony warrants the conclusion that the employee has rebutted any natural inference of prejudice from the delay in notice and filing claim. Except for finding that the employee obtained medical treatment promptly, the board has made no subsidiary findings of fact which give us guidance about what relevant testimony the board found to be true or significant. It, of course, may have relied in part upon evidence other than that summarized above. We have no adequate basis for knowing whether, in reaching the conclusion that there was no prejudice, the board applied correct legal principles. This is by no means a case (see discussion in *Cahill's Case,* 295 Mass. 538, 539–540; see also *Judkin's Case,* 315 Mass. 226, 227–228) where, despite the inadequacy of the board's subsidiary findings, no reasonable inference that the insurer was prejudiced could be drawn from the evidence. On the contrary, the evidence in many respects suggests possibility of prejudice similar to that held to exist in *Russell's Case,* 334 Mass. 680, 683–684. This is precisely the type of case (see e.g. *Meagher's Case,* 293 Mass. 304, 308–309) in which there is need for adequate findings of the subsidiary facts upon which the board relies in reaching its conclusion.

We should not pass upon the issues here presented until the record, particularly with respect to the issue of prejudice, has been clarified by proper subsidiary findings of a character the absence of which has been noted above. This view is based upon considerations similar to those which led to remanding the case to the board in *Messersmith's Case,* 340 Mass. 117, 119–120, and *Ackroyd's Case,* 340 Mass. 214, 220–221. See *Crawford's Case,* 340 Mass. 719, 720–721, and discussion in *Judkins's Case,* 315 Mass. 226, 227. See also *Ratigan's Case,* 338 Mass. 712, 718–719. The board should not deal with issues arising under §§ 41, 42, 43, 44, and 49 merely by general conclusions that there has or has not been prejudice. In this type of case the board should find ex-

pressly those subsidiary facts upon which it relies. It should not leave counsel and the courts, without any reasonable guidance, to search long records for fragments of evidence, which, if believed, cumulatively might warrant some inference sufficient to support whatever conclusion the board has reached.

2. As stated above, the printed record does not contain a copy of the original claim or any reference to the date of its filing. It also does not include various other documents referred to in a motion for extension of the record filed by the insurer in this court before the arguments. In an affidavit accompanying his motion, counsel says, ". . . when the insurer was notified that the certified copy [of the record before the board] was ready for filing in the Superior Court, a messenger . . . was sent to pick up the record . . . and . . . file it in the Superior Court; . . . when I argued the case in the Superior Court, I assumed all the necessary papers had been certified and nothing put me on notice to examine the certified copies in the Superior Court; '. . . the first time I realized that the record was deficient, was after receipt of the printed record and the time came to prepare my brief . . . ." It is the duty of counsel to make certain that appeal records are complete and promptly to take steps to have them corrected if deficient. See *Linse* v. *O'Meara,* 338 Mass. 338, 340. See also *Dargis* v. *Lane,* 331 Mass. 759, for a case in which the absence of a complete record deprived an appellant of a broad review in equity. At this late stage of the case, the motion should be denied. This denial, however, is without prejudice to further action by the insurer to obtain a complete record for the Superior Court, if there are further proceedings in that court after additional findings by the board.

3. The decree of the Superior Court is reversed. The case is to be remanded to the board for appropriate subsidiary findings relating to the issues of notice, late filing of claim, employer's and insurer's knowledge of injury, and prejudice, and for such further proceedings, which may include the taking of additional testimony, as may be consistent with this opinion.

*So ordered.*