## DAVID T. ARMSTRONG'S CASE.

Suffolk.  October 9, 1984. — December 31, 1984.

Present: GRANT, CUTTER, & PERRETTA, JJ.

*Workmen's Compensation Act,* Double compensation, Serious and wilful misconduct of one exercising superintendence, Filing of claim.

Evidence of the circumstances in which a workman was injured by timber falling from a high-rise building under construction warranted a finding that there was "serious and wilful misconduct" within the meaning of G. L. c. 152, § 28, on the part of the workman's employer. [148-151]

In a workmen's compensation case in which there was a six-year delay in filing a claim for double compensation under G. L. c. 152, § 28, the evidence, including evidence that the workman was seriously impaired mentally for a considerable time after he was injured and that the employer had knowledge of the circumstances of the accident and ample opportunity for investigation, warranted findings that there was reasonable cause for the delay in filing the claim and that neither the employer nor its insurer was prejudiced by the late filing. [151-153]

CERTIFICATION to the Superior Court of a decision by the Industrial Accident Board.

*Norman P. Beane, Jr.* (*Edward J. Murphy, Jr.,* with him) for the employee.

*Jerome P. Facher* for the employer.

*David L. Cronin,* for the insurer, submitted a brief.

CUTTER, J. Armstrong was employed as a cement mason by Carlyle Construction Corporations of Massachusetts I and II (Carlyle) while Carlyle was erecting the two forty-story Harbor Towers apartment buildings near Atlantic Avenue, Boston. He was injured very seriously on March 10, 1971, when the construction had gone up at least twenty-five stories.

The present case arises because of Armstrong's claim under G. L. c. 152, § 28, as appearing in St. 1943, c. 529, § 9, permit-

ting the recovery of double compensation by an "employee . . . injured by reason of the serious and wilful misconduct of an employer or of any person regularly intrusted with and exercising the powers of superintendence." The claim under § 28 was filed on May 9, 1977, and received by the Industrial Accident Board (the Board) on May 11, 1977. Two principal issues thus are presented: (1) whether the injuries were caused by serious and wilful misconduct attributable to Carlyle, and (2) whether basis existed for finding (a) that there was reasonable cause for failure to file a claim under § 28 within the one-year limitation provided by G. L. c. 152, § 41, or (b) that Carlyle and its insurer were not prejudiced by the delay in filing the § 28 claim. See G. L. c. 152, § 49.

The § 28 claim[1] was heard by a single member at some sixteen sessions spread out from December 20, 1977, to August 9, 1981. The single member's report was not filed until March 22, 1982. The "findings and decision" allowing Armstrong compensation under § 28, contained in that report, were adopted by the reviewing board on January 20, 1983. Enforcement in the Superior Court of the reviewing board's decision was denied on October 6, 1983. Armstrong has appealed. We reverse the action of the Superior Court.

### The Circumstances of Armstrong's Injury.

On the difficult issue whether Carlyle was guilty of serious and wilful misconduct, the single member made essentially the findings set out below. We treat them as adequate but note that the subsidiary findings should have been more complete and much more incisively and clearly stated.[2]

---

[1] After the accident Armstrong received the usual worker's compensation benefits from the insurer, and his extensive medical bills have been paid. The present case involves only questions relating to his claim to double compensation under § 28.

[2] The single member, to an undue extent, "improperly recited . . . testimony without clearly making findings about it as . . . [the single member] should have done." See *Messersmith's Case*, 340 Mass. 117, 119 (1959); *Ballard's Case*, 13 Mass. App. Ct. 1068, 1069 (1982). See also *Dillon's Case*, 324 Mass. 102, 109-110 (1949); *Herson's Case*, 341 Mass. 402, 406-408 (1960). The form of the single member's recitals, however, which

On the ground floor of one tower (Tower II) of the Harbor Towers project were a rental office and some model apartments. From this office a walkway ran to Atlantic Avenue. This walkway, shortly before Armstrong was injured, had been covered by a "weight bearing structure" (hereafter "the bridge")[3] to protect visitors from materials falling from the towers, which were rapidly growing higher. Prior to the accident, debris from the building had broken planks on the bridge, and it was decided by senior representatives of Carlyle to place four inches of concrete on the surface of the bridge.[4]

Armstrong, on the morning of the accident, was sent by the cement mason foreman in Tower I, at the instruction of the latter's own foreman, Victor Leo, to Tower II to undertake this work. It could be found that three other employees already had refused to go because of the danger from falling debris. Armstrong initially refused to go, but eventually did proceed to Tower II. "Stripping" operations (i.e., tearing out wooden molds for concrete) were proceeding on the upper floors of Tower II and debris had been falling from its upper floors and from materials being hoisted from one floor to another by an overhead crane used in the course of hazardous modern high-rise construction. Armstrong was climbing a ladder to the top

summarized testimony (including that of representatives of Carlyle) to which she gave "credit," suggests that the recitals were intended essentially as subsidiary findings. See and compare *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 662 (1984). Carlyle does not seem to argue that the subsidiary findings were inadequate so we do not remand the single member's report to the Board for more suitable findings, which would cause inappropriate further delay as the single member is no longer on the Board. The recitals of evidence at least serve as general references to evidence which the single member thought supported the ultimate findings. See Locke, Workmen's Compensation §§ 583, 585-586 (2d ed. 1981 & Supp. 1984).

[3] An overhead wooden protection, extending about twelve feet from the perimeter of each tower building, was erected near ground level by Carlyle when the towers had reached three stories in height. This overhead protection is not shown to have extended over the area where Armstrong was injured, and is mentioned only as an instance where Carlyle took steps to protect persons on the ground from falling objects.

[4] The single member found that the bridge had been built by the carpenters on a Saturday when no other project work was in progress above them.

of the bridge, when he was hit on the head by a four by four inch timber about eight feet long. His hardhat was shattered, his skull was broken, and he was permanently and totally disabled. The single member expressly found that, after Armstrong was injured, "carpenters and laborers worked overtime" that day to install safety netting on Tower II.

The single member then found that Carlyle "recognized the . . . danger to their employees during the stripping operation, and . . . ordered safety nets several weeks prior to March 10, 1971," and that these nets, although "on the premises" on that day, "were not secured to the towers." The single member concluded that, because of Carlyle's "failure to erect the safety nets," Armstrong was injured, and that he would not have been injured "if the proper netting had been in place." The single member referred to testimony about complaints, made before Armstrong's injury, by union officials about falling debris. Some complaints were said to have been made at safety meetings held by Carlyle. The single member also found that "failure to have . . . nets in place prior to . . . the accident" was a violation of safety Bulletin #12 of the State Department of Labor & Industries §§ 4.3 Overhead Hazards, and 4.4 Overhead Construction, as in effect in 1971. This was a matter which, although by itself not conclusive even if the single member correctly interpreted the bulletin, reasonably could be taken into account by the single member. The single member's ultimate finding was that "to have ordered[5] . . . [Armstrong] to work on . . . the 'bridge' without safety nets being in place and without shutting down operations in Tower I and Tower II demonstrates such disregard for the probable consequences . . . as to constitute serious and wilful misconduct on the part of" Carlyle.

What constitutes "serious and wilful misconduct," sufficient to support double compensation under § 28, has been discussed

---

[5] The evidence did not indicate that Armstrong was threatened or coerced into doing the work. We interpret the word "ordered" as meaning no more than that he was assigned by his foreman to that dangerous task during which he was injured. Cf. *O'Leary's Case*, 367 Mass. 108, 115 (1975, where the foreman's words amounted to an order).

in many cases. See for examples of the more recent decisions (which amply refer to the earlier cases), *Scaia's Case*, 320 Mass. 432, 434-435 (1946, where, per Qua, J., it was held "that the evidence [concerning the inadequacies of a chain which broke] fell short of enough to warrant a finding of an easily perceptible danger coupled with the high degree of likelihood that harm would result which is required to carry a case across the line from negligence or gross negligence into the territory of wanton and reckless conduct"); *O'Leary's Case*, 367 Mass. 108, 114-117 (1975, dangerous work on steel beams with shear connectors attached, ordered, with somewhat more of a threat, see note 5, *supra*, than in the present case, could be found to be serious and wilful misconduct and involve conduct of a quasi criminal nature). See also *Memmolo's Case*, 17 Mass. App. Ct. 407, 412 (1984). Compare a somewhat analogous case under c. 152, § 27, *Dillon's Case*, 324 Mass. 102, 109-110 (1949).

Although the evidence was conflicting on many points, we conclude that it could be found to establish (a) that Carlyle and its officers, supervisors, and foremen knew that there was a dangerous condition of falling debris necessitating further protection for persons walking under the bridge; (b) that the bridge required substantial strengthening; and (c) that Armstrong was assigned to the work without Carlyle's taking adequate and effective precautions (as was done when the carpenters built the bridge, see note 4, *supra*) to ensure that no debris would fall while he was exposed to risk. The single member's conclusion that there was serious and wilful misconduct by Carlyle (adopted by the board) was warranted by the evidence.

### Late Filing of Claim Under § 28; Absence of Prejudice.

The single member's findings concerning late filing of the § 28 claim (which also suffer from the serious defects mentioned in note 2, *supra*) include the following findings and recitals supported by evidence: (a) Armstrong has no memory of the accident. A deposition received in evidence from the doc-

tor at Massachusetts General Hospital who took care of him shortly after his injury and periodically thereafter shows the original seriousness of his injuries, the consequent "retrograde amnesia," and Armstrong's slow but very remarkable improvement from what his initial condition had been. (b) Armstrong at first had counsel, retained for him by his union business agent, of whose representation of him Armstrong first learned approximately two years after his injury. He met this attorney only twice at the Board's offices in connection with a disfigurement claim under G. L. c. 152, § 36. This lawyer died, probably (although this is not clear from either the single member's report or the evidence) before Armstrong's present counsel appeared in the case in May, 1977. Armstrong, beginning in 1975, for about a year, talked to a personal friend, a lawyer, about his injury, but it was not shown that the friend entered any appearance for him or represented him. (c) Armstrong could be found to have been seriously impaired mentally for a considerable period and to have required at least five years of direct treatment for a severe permanent brain injury, including at least twenty-one hospitalizations and some seventeen operations. He was under treatment by a psychiatrist for a year or more about 1976.

The single member may have intended to find, as appropriately could have been done, that these circumstances amounted to "reasonable cause" for delay in filing the § 28 claim. See G. L. c. 152, § 49; *Wheaton's Case*, 310 Mass. 504, 508-509 (1941); *Whitlock's Case*, 361 Mass. 878 (1972). In any event, the single member concluded in effect that the insurer and Carlyle were "not prejudiced by the delay" (see c. 152, § 49). On the issue of prejudice, reference was made to the following circumstances: (a) Epstein, an officer of Carlyle, was on the Harbor Towers premises when the accident occurred. He went at once to the accident scene and then with associates to the top of Tower II and walked down through eight to ten lower floors, where work was proceeding, in an effort to discover the source of the timber. The employer had "clear opportunity . . . to investigate and . . . did investigate the accident immediately following" it. (b) "The insurer and

. . . [Carlyle] were well aware of the circumstances of the accident," and the insurer's safety inspector investigating "two days after the accident . . . was shown netting . . . [then] being installed." There then was stripping going on at the eighteenth and nineteenth floors. (c) At the many hearings before the single member, a substantial number of pertinent records (as well as witnesses who testified as to their observations of the site at the time of the accident) were produced by the employer. Because of the dilatory manner of conduct of the hearings before the single member, Carlyle, of course, had ample opportunity between hearings to search its records and to try to find any missing witnesses really important to its case. These circumstances[6] persuaded the single member "that neither . . . [Carlyle] nor the insurer have been prejudiced."

The single member recognized that Carlyle's safety engineer did not testify and that the minutes of only three safety meetings held prior to Armstrong's accident could be produced. The record shows that the foreman in Tower I (who sent Armstrong to Tower II) did testify, as did Carlyle's general construction superintendent on the job, and various fellow employees and foremen on duty on the day of the accident. One masonry superintendent, Victor Leo, reported as out of the country, did not testify. We cannot say that the single member did not have support in the evidence and in what witnesses and records were available at the hearings for the conclusion that Carlyle and its insurer were not prejudiced by the late filing of the § 28 claim. See *Thayer's Case*, 345 Mass. 36, 41-46 (1962, where, however, no contention was made that witnesses had become unavailable because of the delay.[7]

---

[6] Epstein's testimony about the investigations made after the accident and the rapid efforts by him promptly to provide safety nets to prevent a recurrence, all justified a conclusion that he knew the extent of Armstrong's injuries, and it could have been found that (from his construction experience) he had reason to expect that a § 28 claim was probable, or at least a strong possibility. There was evidence also casting doubt on the vigor and imagination of the search by Carlyle for missing witnesses and documents.

[7] We recognize that the burden of proving lack of prejudice with respect to delay in filing a claim is on the employee. *Russell's Case*, 334 Mass. 680, 682 (1956). *Herson's Case*, 341 Mass. 402, 406-407 (1960). Whether

The judgment is reversed. A new judgment is to be entered in the Superior Court upholding the Board's decision.

*So ordered.*

---

the burden has been satisfied is a question of fact for the Board. See *Lupia's Case*, 347 Mass. 678, 680 (1964), and cases cited. In the somewhat unusual circumstances of the present case, and taking account of all the findings and the evidence, viewed as a whole, the single member properly could conclude that any inference of prejudice from the late filing had been rebutted.